Syllabus.

### Richmond.

## WILSON, TRUSTEE, v. CARPENTER'S ADM'R.

### MARCH 14, 1895.

1. RESCISSION—*False Representation—Intent.*—The false representation of a material fact, constituting an inducement to a contract for the purchase of real estate, on which the purchaser had a right to rely, is always ground for a rescission of the contract by a court of equity. The intent of the party making the representation, and his belief in its truth, are alike wholly immaterial. It is sufficient that the statement is material, was relied on by the purchaser, and was in fact untrue.

2. RESCISSION—*False Representation.*—A representation that $1,500,000 has been secured to be invested in industrial enterprises in a proposed town is material, and if by such representation a person is induced to purchase real estate in such proposed town, and the representation is false, it is good ground for the rescission of such contract by a court of equity.

3. RESCISSION—*False Representations—Similar Representations to Others.*—In a suit to rescind a contract for false representations, evidence of similar representations to other persons, about the same time, is admissible to show the bent of mind of the party making the representation.

4. FALSE REPRESENTATION—*Inducement—Inference.*—When the seller has made a false representation which, from its nature, might induce the buyer to enter into the contract on the faith of it, it will be inferred that the buyer was thereby induced to contract, and to remove this inference the *seller* must prove either that the buyer had knowledge of facts which showed the representations to be untrue, or that he expressly stated in terms, or showed by his conduct, that he did not rely upon the representation, but acted on his own judgment. Nor is the buyer deprived of his right to relief because he had the means of discovering that the representation was false.

5. FRAUDULENT CONTRACT—*Confirmation—Waiver.*—Where the original contract is tainted with fraud, its subsequent confirmation must be a solemn and deliberate act. If a waiver is relied on, it must appear that such waiver was distinctly made, with full knowledge of the rights intended

91 | 183
92 | 77
91 | 183
95 | 165
95 | 372
95 | 491
91 | 183
96 | 262
96 | 656
91 | 183
97 | 282
91 | 183
98 | 542
91 | 183
100 | 731
91 | 183
105 | 15
91 | 183
107 | 28
91 | 183
109 | 601
f109 | 610
f109 | 794
91 | 183
110 | 134

to be waived; and the fact that the rights are known and intended to be waived must plainly appear. *Montague's Adm'r* v. *Massey, Auditor*, 76 Va. 307, approved.

Appeal from a decree of the Circuit Court of Rockbridge county, pronounced March 20, 1893, in a suit in chancery wherein the appellee was the complainant, and the appellants were the defendants.

*Affirmed.*

The opinion states the case.

*Frank T. Glasgow*, for the appellants.

*Strayer & Liggett*, for the appellee.

HARRISON, J., delivered the opinion of the court.

Robert N. Wilson held, as trustee for himself, David B. Taylor, Thomas S. White, Fitzhugh Lee, and others, with full power to sell and convey the same, lot No. 20 in block 127 on McCullough street, in the town of Glasgow. He placed the lot in the hands of Thomas S. White & Co., real estate agents, for sale. In September, 1890, Thomas S. White sold the lot to William H. Carpenter, of Rockingham county, for the sum of $1,500; the purchaser paying in cash $400, and executing two bonds for $550 each, at six and twelve months, with interest, for the residue, receiving from R. N. Wilson, trustee, a deed of conveyance for the lot, dated September 23, 1890, and contemporaneously therewith executing a deed of trust to secure the two deferred bonds. Before the first bond became due, Carpenter paid the same. When the second bond became due, in September, 1891, it was not paid.

On the 3d day of November, 1891, William H. Carpenter filed his bill in the Circuit Court of Rockbridge county against R. N. Wilson, Thomas S. White, and the other owners of said

lot, praying for a rescission of his contract of purchase. Before the case was ready for hearing, however, the plaintiff died, and it was revived in the name of J. N. Keagy, his administrator.

The bill sets forth the foregoing facts in regard to the sale and purchase of said lot, and alleges that the purchase was made on the positive assurance from Thomas S. White, agent, that the Rockbridge Company, promoters of the town, had already secured beyond a doubt $1,500,000 from an English syndicate; that this large sum of money was to be used in building up and carrying on industrial enterprises at Glasgow, which would cause real estate to advance very rapidly, start the town on a "boom" on a grand scale, and make it a manu-facturing place of great importance.

The complainant further alleges that he knew nothing himself of what was proposed at Glasgow, and relied solely on the representations of said White, and by reason of the representations and assurances thus made, and especially the representation that $1,500,000 had been secured to be invested at once in manufactories, he was induced to buy the lot; and that, but for such assurances, he would never have invested a dollar in the town of Glasgow.

The bill further alleges, that the statements made by Thomas S. White were untrue, false, and fraudulent; that not a dollar of the English money had ever been invested in Glasgow; that the English syndicate never completed any contract with the Rockbridge Company, and that all negotiations in reference thereto have long since failed, without hope or expectation of being revived; that, so far from the lot purchased by him advancing in price, it had little or no value.

The bill prays that the contract of purchase be rescinded; that defendants be required to repay the money paid on the purchase; that the lot be reconveyed to R. N. Wilson, trustee,

and that he be enjoined from collecting the remaining unpaid bond.

The injunction was granted as prayed for, and on the 1st day of March, 1892, the defendants filed their joint and separate answer, demurrer, and cross bill, admitting the sale of the lot by their agent, White, and its purchase by Carpenter, and alleging that none of them but Thomas S. White, through whom the sale was made, were cognizant of the facts and circumstances attending the sale; the defendant Thomas S. White denying that he made the positive assurance alleged in the bill as to $1,500,000 having been secured by the Rockbridge Company from the English syndicate, and further denying that the alleged representations and assurances caused the plaintiff to invest at Glasgow; that many prudent and cautious business men were at that time buying lots there, believing it would grow into a large town. The respondents call for strict proof of all charges in the bill, and ask for a decree for the balance due from the purchaser.

Evidence was taken by the plaintiff and defendants, and on the 20th day of March, 1893, a final decree was entered, overruling the demurrer; declaring that the sale of the lot was induced by false representations of the defendants, which were material, and to the injury of the purchaser; rescinding the contract of sale; canceling the unpaid bond; appointing a special commissioner to reconvey the lot to R. N. Wilson, trustee; and decreeing that the defendants pay to the administrator of William H. Carpenter $1,070, with interest on $947.13 from March 1, 1893, and costs of suit—that being the amount paid by his intestate on the lot. From this decree an appeal was granted the defendants, Thomas S. White and others, to this court.

The question presented by the pleadings for determination is one of fact. The law applicable to a case of this sort is too well settled to be any longer doubted or called in question.

No man is bound by a bargain into which he has been deceived by fraud or misrepresentation. Whenever a purchaser has been induced, by a material misrepresentation of the vendor, to buy, he has a right to repudiate the contract; a right correlative with that of the vendor to disaffirm the sale when he has been defrauded. Courts of equity are always open to afford relief in such cases, and false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity. *Crump* v. *U. S. Mining Co.*, 7 Gratt. 352; *Grim* v. *Byrd*, 32 Gratt. 293; *Linhart* v. *Foreman's Adm'r*, 77 Va. 540; *Rorer Iron Co.* v. *Trout*, 83 Va. 397; Pom. Cont. § 12, p. 289.

Further elaboration of the law on this subject would be unprofitable repetition. It is only necessary to consider the evidence, and determine whether or not it makes a case entitling the plaintiff to a rescission of the contract, as prayed for in the bill.

The depositions of L. A. Crenshaw, of Richmond, and J. G. Millinger, of Frederick county—two intelligent and disinterested witnesses—have been taken by the plaintiff. They were both in Glasgow in September, 1890, and present with William H. Carpenter and Thomas S. White, and heard the conversation which led to the purchase of the lot by Carpenter.

L. A. Crenshaw testified that White made to Carpenter the representation and assurance that the $1,500,000 of English money had already been secured by the Rockbridge Company; that it would be at once invested in manufacturing enterprises in Glasgow; that it would cause the town to build up rapidly, and that those who purchased lots then would realize very handsome profits in a very short time; that there was nothing in Glasgow to induce a man to invest money except this representation that $1,500,000 had been secured for the purpose of building industrial enterprises there.

J. G. Millinger testified still more clearly and strongly to this representation made by White to Carpenter. He says that White stated in the most positive and unqualified way that the English money had been already secured through William A. Anderson, the vice-president of the Rockbridge Company, who was then in England; that nothing remained but for Gen. Fitzhugh Lee, the president of the company, to sign the contract. He says: "I heard White tell Carpenter that the $1,500,000 was secured, and the lot would advance rapidly in value; that the money was to be all invested at once in manufacturing enterprises, which would build the town up very rapidly." The witness says that he was informed that Mr. White was a reliable man, and that he did not doubt the truth of his statements to Carpenter; that he had Mr. White's word for it, and had no doubt of its truth; that nothing was lacking, so far as that was concerned, to induce witness to buy. He did not buy, however, because he concluded it would be best to wait until the manufactories were built; not because he doubted Mr. White's statement, but because he thought there would be as much room for speculation after they were built as before.

This testimony proves clearly and satisfactorily that the representation of Thomas S. White that the Rockbridge Company had secured $1,500,000 was made by him as charged in the plaintiff's bill. It is a conceded fact in the case that it never was secured, and the evidence shows that it was never at any time certain that it would be.

Mr. Anderson, in his report from London to the company, dated August 27, 1890, says: "*A graver question is, will the contract be made good by the payment of the money?*" In his deposition he says he cabled Gen. Fitzhugh Lee, the president of the company, to call a meeting of the board, and added these words: "*Nothing certain until contract ratified and money paid.*" There was nothing in these communications

to justify the assurance that the English money had actually been secured.

The witness Crenshaw files with his deposition several letters received by him from Thomas S. White & Co. The first is without date, but the witness says it was written about the time of the sale of this lot to Carpenter. In this letter the writer says: "*English money, actually in Glasgow Commercial Bank, and company registered in London last week; this being the last official act necessary to bringing out the British company.*" The second letter is dated November 3, 1890, in which the writer says: "*The English question is settled at last. We get the first installment of $70,000 on the 20th prox.*" The third letter is dated November 7, 1890, in which it is said: "*We have it from General Lee, Judge Edmondson and other Glasgow directors that the English deal is absolutely and irretrievably closed.*"

The representations in these letters are not evidence of the statements made by White to Carpenter at the time of the sale of the lot to him, but they are very persuasive as showing the bent of Mr. White's mind on the subject of this English money.

There is no evidence in the record that weakens the force of the testimony of the witnesses Crenshaw and Millinger. Their evidence is conclusive of the question that the representations were made as charged by the purchaser in his bill. It cannot be doubted that the statement was made for the purpose of procuring the contract, and it is conceded to be untrue. As to the knowledge and belief of Thomas S. White in making this statement, it is unnecessary to inquire. It should be stated, however, that counsel for appellee properly disclaim any purpose to charge willful fraud, nor does this court hold the appellant guilty of intentional fraud and misrepresentation. It is a matter of no consequence to William H. Carpenter what Mr. White thought. The intent of the party making the

representation is wholly immaterial. The point is, has the other party been misled? It is sufficient that the statement is actually untrue, so as to mislead the party to whom it is made. The party making it need not know of its falsity, nor have any intent to deceive; nor does his mere belief in its truth make any difference. A party making a statement as true, for the purpose of influencing the conduct of the other party, is bound to know that it is true. Pom. Cont. sec. 217.

It is contended by counsel for appellant that Carpenter did not rely upon the representations of Thomas S. White, but was influenced by other considerations. There is nothing in the record to show this. On the contrary, the tendency of all the evidence is to establish the fact that he was controlled in this purchase entirely by his confidence in White, who had been highly recommended to him by D. B. Taylor, one of the owners of the lot sold; and that he was induced to buy almost exclusively by the representation about the large sum of money secured in England.

When the seller has made a false representation, which, from its nature, might induce the buyer to enter into the contract on the faith of it, it will be inferred that the buyer was induced thereby to contract, and it does not rest with him to show that he, in fact, relied upon the representation. In order to displace this inference, the seller must prove either that the buyer had knowledge of facts which showed the representation to be untrue, or that he expressly stated in terms, or showed by his contract, that he did not rely upon the representation, but acted upon his own judgment.

Nor is the buyer deprived of his right to relief because he had the means of discovering that the representation was false. *Redgrave* v. *Hurd*, 20 Ch. Div. 1, quoted in Benj. Sales, p. 499.

The last element of a misrepresentation is its materiality. The evidence shows that Carpenter gave $1,500 for this lot,

and that it is not worth now $50, if anything.    It can hardly be doubted that, if $1,500,000 of English capital had been invested at Glasgow in manufacturing enterprises, this lot would be worth more than it is now.    The court does not inquire with any care into the extent of the prejudice.    It is sufficient if the party misled has been very slightly prejudiced— if the amount is at all appreciable.    Pom. Cont. sec. 227.

Counsel for appellants insist that, even if Carpenter had any ground of complaint originally, he ratified fully what he had done, after the collapse at Glasgow; and in support of this contention refer to certain letters of Carpenter written to R. N. Wilson, trustee, and Thomas S. White & Co., after February 20, 1891, when all further negotiation with the English ceased.    This fact, it is said, became generally known, and should have been known to Carpenter, too; and that in these letters he should have referred to White's representations, and his reliance upon them.

These letters do not sustain this view.    Wilson, trustee, had been writing, urging the payment of the last bond in advance of its maturity.    Carpenter's letters to him were in response, telling him he was unable to pay, and could not pay the bond when due, unless the lot was sold; and urging Wilson not to put his note in bank for collection; that he would pay it as soon as possible.    The letters to Thomas S. White & Co. were in reference to the value and prospect of selling the lot.    And as late as April, 1891, one of these letters was asking White if he could get more than $2,500 for the lot, and reminding him of his expressed opinion that such price could be obtained in April.    It is impossible to believe that Carpenter knew, when that letter was written, that all hope of getting the English money had some time before ceased.    All these letters indicate that Carpenter was ignorant of the fact.    He could not have entertained the hope, expressed by him, of selling the lot, if he had known it.

The record discloses no word or act of Carpenter that can fairly be regarded as a ratification of his purchase from Thomas S. White, after becoming acquainted with the misrepresentation by which he had been induced to buy. "Confirmation must be a solemn and deliberate act. When the original transaction is infected with fraud, the confirmation of it is so inconsistent with justice, and so likely to be accompanied with imposition, that the courts watch it with the utmost strictness, and do not allow it to stand but on the clearest evidence. *Cumberland Coal Co.* v. *Sherman*, 20 Md. 117.

No man can be bound by a waiver of his rights, unless such waiver is distinctly made, with full knowledge of the rights which he intends to waive; and the fact that he knows his rights, and intends to waive them, must plainly appear. *Montague's Adm'r* v. *Massey*, 76 Va. 307.

The views which have been expressed support the decree of the Circuit Court, and it must be affirmed.

KEITH, P., RIELY, and BUCHANAN, JJ., concur with HARRISON, J.

CARDWELL, J., dissenting, said:

I do not disagree with my brethren as to the law of this case, but, applying the law to the evidence, I am unable to agree that appellee is entitled to the relief afforded him by the decree of the Circuit Court of Rockbridge county complained of.

AFFIRMED.