## FRAUD IN THE SALE OF AN OIL LEASE.

[Circuit Court of Wood County.]

HARRY JONES ET AL V. CHARLES H. DRAPER.

Decided, November, 1903.

*Agency—Where the Agent Represented Both Parties—Sale of an Oil
Lease—Subterfuge and Misrepresentation—Inspection Prevented—
Fraud Upon Co-partners—Rights of Innocent Purchasers—The Sale
Rescinded.*

1. To relieve an agent from the suspicion of inconsistent duties, which
   *prima facie* will be assumed from the fact that he represents both
   parties, it is necessary that every circumstance connected with his
   employment by either party should be communicated to the other;
   and where the basis of the commission to be paid for his services
   was changed from usage to contract, and the amount to be paid
   from $3,000 to $6,500, such change was a circumstance affecting the
   action of the agent, and the failure to disclose it was a fraud in
   law.
2. The reply to a direct question as to what was the production of
   certain oil wells, that "I run two one-hundred barrel tanks a day,"
   was a subterfuge and misrepresentation, where the fact was that
   the production alluded to was some weeks previous, while the pro-
   duction at the time the inquiry was made with a view of pur-
   chase was only fifty-three barrels a day.
3. If an inspection was prevented or its completeness defeated by the
   acts, arts or words of the seller, the reliance of the purchaser upon
   the statements of the seller without such investigation or after an
   incomplete investigation, would be justified.
4. Where evidence is introduced tending to show that one member of
   a firm committed or consented to the commission of a fraud upon
   his co-partners, notice on his part is not notice to them.
5. Nor will equity refuse aid to innocent purchasers because of a fraud
   committed upon them by a co-purchaser, and if their rights can
   not be secured without releasing him, they will not be allowed to
   suffer on that account.
6. Allegations having been established to the satisfaction of the court,
   that the plaintiffs were induced by the paid agent of the defendant,
   who they supposed was their agent, to purchase for $60,000 an oil
   property which was only worth $15,000, that the representations
   upon which they relied were untrue, and that their investigations

as to the value of the property were checked and prevented by the defendant. *Held:* That the contract of purchase be decreed void and the conveyance rescinded, and the money paid be restored with interest at 6 per cent., the purchase money notes canceled, and for the money expended by plaintiffs in putting the lease in condition to operate and in improvements, which have increased the value of the lease, they are to be given a lien on the lease and property.

MOONEY, J. (sitting in place of Parker, J.); HULL, J., and HAYNES, J., concur.

This case is here on appeal from the court of common pleas.

Plaintiffs in their petition allege, in substance, that some months prior to November 8, 1902, they undertook the promotion of a corporation to be known as The Cleveland-Scranton Oil Company, designed to engage in the business of developing, operating for, and producing oil in the Ohio oil fields, and to that end solicited numerous persons to subscribe and pay for stock of the corporation to be organized, said payments to be made to plaintiffs, as trustees, to purchase oil producing properties and to hold title to the same until such time as the proposed corporation should be organized and empowered to do business in Ohio, when said title should be conveyed to the corporation and stock therein issued to the contributors of the purchase price of said properties; that plaintiffs were then without experience in the oil business and had then no knowledge of the market value of oil producing properties in this state, and for these reasons they associated themselves with and employed as their trusted and confidential agent, to examine and select such oil properties to be purchased, one A. J. Thomas, of Findlay, Ohio, a man of great experience in the business of producing oil in the Ohio fields, and plaintiffs relied exclusively upon the business judgment and fidelity of said Thomas in making said selection and in closing said purchases; that among the properties selected by said Thomas as said agent were certain oil leases with the wells, machinery, fixtures and appliances then situated thereon owned by defendant at the price of sixty thousand dollars ($60,000); that at the time of said selection by Thomas, and at all times thereafter until December 18, 1902, the wells on said leases were out of repair and not in actual operation, and for that reason it was impossible to

ascertain what said wells were capable of producing when in repair and in proper working order; that defendant represented to plaintiff that said wells were then capable of producing at least forty barrels of oil daily, and that no wells had ever been drilled upon any part of said land except upon the outside edges thereof, and that the whole central area of said land was virgin oil territory with many inside locations defined and known to be prolific territory which had never been drilled to drain or deplete the oil in said land, upon all of which statements so made by defendant, these plaintiffs and their beneficiaries relied; that after all this and on November 8, 1902, said Thomas as said agent and confidential adviser recommended to plaintiffs, as said trustees, the purchase by them of said property of defendant for $60,000; that on said day plaintiffs did accept a conveyance of said property for said price, less $300 deducted therefrom for repairs, and then paid to defendant in money $9,700, and delivered to defendant their notes aggregating $50,000, which notes and money are still retained by defendant; that on said day plaintiffs took possession of said property, and thereafter expended a large sum of money to put said property in condition to operate and to determine the character and capacity of said wells; that plaintiffs have just discovered and now charge: First, that defendant paid said Thomas a large commission to induce him to recommend said property to plaintiffs and to procure said purchase by plaintiffs: Second, that the statement that no wells had been drilled within the central area of said land was and is untrue; Third, that the wells on said lease were not and are not capable of preducing forty barrels of oil per day, nor any amount in excess of ten or twelve barrels per day; fourth, that both defendant and said Thomas at the time "they beguiled plaintiffs into making said fraudulent contract" well knew that the market value of said property did not exceed $15,000; that plaintiffs before the commencement of this action tendered to defendant a reconveyance of said property and demanded a return of the money paid and notes delivered by them to defendant as heretofore stated, and defendant declined to accept said reconveyance or to comply with said demand.

The prayer is that said contract and conveyance be adjudged void; that said notes be canceled and said money be ordered returned; that the money expended by plaintiffs upon said property be found to be a lien upon said property and the amount thereof be ascertained on an account taken, and for all proper relief.

Defendant by answer admits the transaction, but denies the fraud. He states that long before said transaction, or any of said negotiations, said Thomas had been retained as a broker by him to make sales of said property, all of which was known to plaintiffs; that the defendant had been interested in said property only about one year, had been upon the same only a few times, and gave plaintiffs all the information he had concerning all the wells drilled on said lease in response to plaintiffs' inquiries. Defendant expressly denies that he stated that the central area of said property was then undrilled, but that on the contrary he stated that the same had been drilled, and that one of the wells drilled thereon had the reputation of producing 8,000 barrels of oil per day; defendant further states that he furnished plaintiffs with the pipe line statement showing the oil produced from said wells in July and August, 1902, and all of which facts were known to plaintiffs at the time of said sale. All allegations of the petition not admitted by the answer are denied. Plaintiffs by reply deny all the affirmative allegations of the answer.

The case was heard and submitted here upon these pleadings and the evidence. A transcript of the testimony given at the trial in the common pleas court was used here.

The objections made there appear in this transcript. We find no rulings there made on the evidence that we are very solicitous to charge, and counsel have argued no questions arising thereon which they deem important. We abide therefore by the rulings made below.

From the evidence it appears that Harry Jones, a resident of Cleveland, one of the plaintiffs here, prior to August, 1902, formed the purpose to associate himself with other persons, then undetermined by him, to purchase oil properties, organize a corporation to own and operate the same, and to reap a joint profit

for himself and associates by conveying the property so pur-
chased to said corporation and selling the stock of said corpora-
tion to an amount sufficient to pay the cost price of the property
and the amount of profit which the promoters might require.
At this time Jones was without experience in or knowledge of the
oil business or the market value of oil-producing properties.
Jones made known his purposes and intentions to A. J. Thomas,
of Findlay, who at that time was experienced in the oil business
and was acquainted with the market values of Ohio oil-producing
properties.   An arrangement was entered into between Jones
and Thomas whereby Thomas undertook to find, if possible, one
or more oil properties that could be purchased and would be suit-
able for the proposed enterprise.   At this time Thomas contract-
ed to associate himself with Jones in the general plan.   After
this arrangement was made, Thomas learned that the defendant's
property was for sale, and upon inquiry of Draper was informed
that the price was $60,000.   On or about September 16, 1902,
Jones, together with one Wilson, who as an expert was visiting
the property in behalf of some intending investor or investors
other than himself, met Thomas by arrangement and they went
to the defendant's lease.   Here they met one Hendricks, who at
that time was with defendant a joint owner of this property.
Wilson informed Hendricks that they had come to look over the
property.   Hendricks, in his testimony on cross-examination
(Transcript, p. 112), details what he said as follows:

"Q.   And he, Wilson, asked you some questions about the
wells?   A.   Yes, sir.
"Q.   And about the production? · A.   Yes, sir.
"Q.   And what do you say you told him?   A.   I told him we
were running about two one hundred barrel tanks a day then."
The fourteenth question after this, in the same cross-examina-
tion of the same witness is as follows:
"Q.   Mr. Hendricks, you say that day, the day that Wilson
was there, in the presence of Mr. Thomas and Mr. Jones, that
you were asked what that lease was doing at that time?   A.   No,
sir.
"Q.   Was you not?   A. · No, sir.
"Q.   Did you make any statement that day as to what that
lease was doing?   A.   No, sir.

"Q.   Did you not tell some one then that you was running two hundred barrel tanks a day?   A.   I said that I had run that.

"Q.   What was the question put to you when you made that answer?   A.   They asked me *what it was doing,* and I told them I had run two hundred barrel tanks a day.   ,

"Q.   Did you not tell them that you were now running that then?   A.   No, sir; I did not."

At about the time of this conversation, Draper arrived at the lease and Hendricks, to use his language, "turned the visitors over to him." When Draper met the parties he was inquired of as to the production. He exhibited to the parties a pipe line statement, the extent of which as to time is in dispute. Draper says the statement covered all the time from October, 1901, to August 14, 1902. Jones disputes this and says the statement covered the first half of August, 1902, only. It is argued that Draper that day by wire ordered a statement covering the month of August, 1902, sent to Wilson at Findlay, because he wanted to base his report upon a full month's statement, and Draper testifies that he, Wilson, wanted to make as good a showing as possible so that the deal would go through. (See transcript, p. 119). The records of the pipe line company do not show that Draper had any such statement as he testifies he had, but, on the contrary, show that the general statement sent him terminated July 31, 1902, and not on date of August 14, 1902. The records further show that Draper ordered and there was sent him a statement for the first half of August, 1902, and that on September 4, 1902, there was sent to him a statement for the whole month of August, 1902. The evidence (deposition of R. L. Bates) further shows that if a large month were wanted, and if defendant had the statement he says he had, that the largest month's production would be for the month beginning July 15, 1903, and ending with the last item in the August half-monthly statement.

It will be noted that after August 14 there were eight tanks only in August, whereas there were fifteen tanks run from July 15 until the end of July. Moreover the distance between the water-marks in the paper still intact is 11 1-4 inches, while the distance between the marks on the upper part of the paper and

upon that on which the August statement appears is only 9 7-8 inches.  If the two parts were part of the same piece of paper, the distance between the marks would be the same.  Since Mr. Draper's explanation does not explain why the month of August was embraced in a single statement to Wilson, since the records of the pipe line company are against his recollection of the facts, and since the physical appearance of the paper is also in dispute of his statement, it must be assumed and held that he is mistaken in his theory as to the extent of the statement he presented to Jones and Wilson on September 16, 1902.  This leads to another inquiry.  On that day, Draper had a statement for the entire month of August, 1902.  It was sent him on September 4, 1902. He had run tickets also in his possession.  He therefore knew what oil was produced in the month of August, yet he does not exhibit that statement.  In the last half of August the lease averaged half a tank a day.  In the first half of August the lease averaged one and one-half tanks per day, and some two days and some days three tanks were run.  The first half of August was in line with what Hendricks had told the parties, the last half was not.  Draper was there that day to see intending purchasers, yet he did not bring the last statement of production, nor did not exhibit it, but did bring another that was favorable to the property and its production.  Afterward several other parties visited the lease.  There were other parties who intended joining Jones in the purchase or intended to purchase stock in the company.  Several of these testify that Draper made statements as to the production of the lease, stating it to be forty barrels per day or more.  Draper denies that he made these statements. The average daily production of the lease in August, 1902, was 53 18-100 barrels; in September, 12 12-100; in October 6 56-100.  During these months, at no time were all the wells equipped for pumping, and at no time were the equipped wells regularly pumped.  At no time prior to November 8 did Thomas take any gauge of the wells.  September 29, 1902, Jones took an option on the property which fixed the price a $60,000.  Thomas acted as Jones' agent in the transaction.  October 22, this option having expired by limitation, it was renewed and extended "for such a length of time as will enable (defendant) first party

to put the twelve wells in operation and first party agrees to put the wells in operation as soon as possible and to extend the time of the within option until said twelve wells are fully equipped and operating to the satisfaction of A. J. Thomas both as to the operation of said lease, its production and its title.'' October 28, Thomas took a statement signed by Jones certifying that he, Thomas, was not a member or stockholder in the purchasers' combine, nor in the corporation, but was at will an employe.

When Draper first entertained the proposition to sell, he told Thomas that there would be five per cent. commission for selling the lease. Thomas informed Jones of this fact, and Jones concluded to divide the commission among the purchasers. Jones says that Thomas stated that by the usage of the oil business, a commission was always paid. This Thomas does not deny. Draper says that he asked Jones whether he was interested in the commission and Jones said ''No, settle that with Thomas.'' Thomas did not know of this statement, and Jones denies it. Draper did not see Jones on the lease after October 28, when for the first time Thomas became solely interested in the commission to be allowed. On October 28, Thomas stipulated with Jones that the commission on the sale should be paid to Thomas as compensation for his services in the deal. About November 1, 1902, Thomas, who before that time had looked after plaintiffs' property as manager, quit their service in that capacity, and on that date stipulated with Draper that upon the close of the deal then pending between plaintiffs and defendant, Thomas should receive (if the property was purchased at the price of $60,000) a commission of $6,500. There is no pretense in the case that any of the plaintiffs except Jones knew of any commission at all, and no claim that Jones knew of any commission except five per cent. and that fixed by the usage of the business and not by contract. November 8 Draper and Thomas were in Cleveland and the deal was then closed, the money paid and notes executed as pleaded.

It is fair to conclude from all the evidence that the property from the time of taking the first option until November 8 was at no time worth in the market to exceed $15,000. It is asserted by one or more witnesses that Draper represented that the central

area was never drilled. Draper denies this, but upon the contrary states that he said the property had been drilled, and pointed out abandoned wells. He says though that he did say that the old territory was then usually redrilled, and that he pointed out where a line of wells could be established. There are several conflicts in the evidence upon important circumstances. One between Cook and Draper; one between Marr on the other hand and Draper and Thomas on the other, and one between Major Miller, and to some extent Bowler and Jones, on the one hand, and Draper and Thomas on the other. Cook says in substance that at one time when he was working for Draper as pumper on this lease and after these negotiations were commenced, he saw Thomas take a gauge of the tank. He told Draper, saying, ''You are caught, Thomas is taking a gauge of the production.'' To which Draper replied ''I can get Thomas.'' Thomas says he did take one gauge and never satisfactorily repeated it, and he as an expert oil man, paid for his services and paid well, whose power and duty it was to pass upon the production of the lease, never took a guage of that production, and he was present when the deal was closed and knew that the east wells were not pumping because the power was not properly located, and two other wells were not then operating, nor were they completely equipped; and he says he held his peace, when every dictate of duty should impel him to speak, and the commission had grown from $3,000 to $6,500! In this view, Cook's statement is not very unreasonable. Marr succeeded Thomas as manager of the leases then owned by plaintiffs, and knew the condition of the property here in question. He met Draper and Thomas at Findlay on the eve of their departure for Cleveland to close the deal. It is conceded that they asked him to accompany them and that he refused. He says they wanted him to say that defendant's property was all right and in pumping condition and that he refused. This Draper and Thomas deny. This was the question, or one of the questions, upon which Thomas was to pass. He was to be paid for it, and Thomas was going to Cleveland. But why was Marr asked to go? The evidence does not satisfactorily answer this question, unless it be to shift responsibility from Thomas. This responsibility was one which Thomas then and

now was disinclined to assume. The testimony of Major Miller we accept as true. His testimony is clear, direct and reasonable. What attorney is there who would not feel inclined in a transaction of this magnitude to see that the interests of his client were secure? And if he started to make any inquiry he would, we believe, ask the very questions he says he asked, and would advise his client not to proceed unless the answers given were direct and satisfactory. That Thomas was averse to answering these questions is doubtless true, but that he was prepared to answer his presence there at that time for that transaction attested. We accept as facts in the case that Thomas, in the presence of Draper, who remained silent, a few minutes before the deal was closed, stated in the presence of Bowler, Jones and others that this lease was then producing forty barrels of oil per day; that it was then in proper operating order except two wells that could be set to pumping for three hundred dollars; that the property could be made to produce a hundred and forty barrels per day and that the central area of the tract had not then been drilled. Bowler and Jones do not now remember this statement, and therefore it does not appear that they relied upon it, but that statement is evidence that Draper before that time, as well as Thomas, had stated these facts as to the production of the property as so many witnesses testify.

October 3, Jones wrote Draper a letter and clearly invited the latter to falsify the production of the lease to a number of persons who would on a specified day visit it. Draper received the letter and filed it away in silence. By this letter Jones may have intended to deceive his associate purchasers or intending purchasers of stock. Draper says he understood that the latter was the purpose. If Jones intended that both himself and his associate purchasers should pay more for the property than it was worth the precedure was folly; if to unload stock on purchasers, it was knavery. There is nothing in the letter or request inconsistent with a belief on the part of Jones that the property would produce and was producing forty barrels daily and that he wanted to show a production above this to secure stock subscribers. If this was the purpose the letter is not here important, for the stockholders are not here complaining. If Jones, know-

ing the actual production of the wells, sought to defraud his associate purchasers, his partners, these other questions hereafter referred to will arise.

The foregoing is a rather too extensive statement of the complicated facts and contradictions in this case. The remaining questions are of law arising upon the facts. These are first, as to the double agency; second, as to the fraud.

1. It can not be doubted in Ohio that an agent under certain circumstances may represent both contracting parties in the same transaction. But to relieve such double agent from suspicion that inconsistent duties have been assumed, which *prima facie* will be presumed, it is necessary that it should appear that knowledge of every circumstance connected with his employment by either should be communicated to the other, in so far as the same would naturally affect his action (*Bell* v. *McConnell*, 37 O. S., 396-402). In this case either the commission was originally fixed at $6,500 and Jones was mislead at all times as to the amount of it, or else when the broker's work had been all done, when the property was practically purchased by plaintiffs, subject only to the expert approval of Thomas as to the operating condition and production of the lease, the amount of commission is increased from $3,000 to $6,500. Not only that, but the basis of the commission instead of being the usage of the business, as Jones was informed, was changed to contract. In any case, such increase of commission and changed in the nature of the claim for it, would be "circumstances naturally affecting the action of the agent." These plaintiffs may have been content for Thomas to receive $3,000 commission fixed by usage or custom on oil sales, when on the eve of the approval of the property by Thomas, they would be unwilling that he should by contract with defendant have the commission raised to $6,500. They are entitled under the rule to be informed of the change in the commission arrangement. They were not not so informed, and the change in the arrangement, if not concealed, was not disclosed. The failure to disclose was a "fraud in law" upon plaintiffs, and on account of it, upon plaintiffs' election and prompt action, the contract will be declared void (Meacham's Agency, Section 798, and cases there cited). Plaintiffs did not know of this change of commis-

sion until this action was brought, and so no claim of want of promptness can be sustained.

2. As to fraudulent misrepresentation, Hendricks admits at one place in his testimony that he misrepresented (p. 112). At one place, a moment later (pp. 113-114), he says that "they asked me what it was doing and I told them I had run two hundred barrel tanks," but did not tell them what it was then doing. This subterfuge can not be allowed. It is perfectly evident that Jones and Wilson wanted to know what the lease was *then* doing; Hendricks knew this and yet he framed his answer so that while true in fact it would be understood by the parties asking the question in a sense in which it was not true.

"No one can evade the force of the impression which he knew another received from his words and conduct and which he meant him to receive, by resorting to the literal meaning of the language used" (*Misner* v. *Kussell,* 39 Mich., 229).

Again, Draper knew on the same day that both Jones and Wilson were there to ascertain the then production of the lease. This was September 16, 1902. On that day Draper had a statement of the oil run during the whole month of August in his possession. This would show an average daily production of 53 16-100 barrels. He had also a statement of the production for the first half of August. This showed a daily production of 89 barrels. He showed the latter to the parties. They, desiring a whole month's statement, instead of producing the one he had, he ordered another from Lima. Under these circumstances it is manifest that both Jones and Wilson would have the right to conclude that the August runs averaging 53 16-100 barrels was a fair statement of the daily production on September 16th. Yet Draper then knew and Hendricks knew and their employe, the pumper, knew that the average daily runs for the first half of September was only 17 65-100 barrels. Having given this statement for August, it is perfectly evident from all the testimony that Draper proceeded thereafter to operate the lease in a manner in which it would be renderd impossible to know what the entire production of all the wells was. The wells were not all pumped at any one time, nor any of them pumped regularly.

It is clear too that Jones and Bowler both believed that the wells would do and were doing more than forty barrels and that Draper knew they believed this, and he was bound to know that from his August statement they believed this.

"Allowing the other party to proceed upon an erroneous belief to which one's acts have contributed is active concealment tantamount to misrepresentation" (Wald's Pollock on Cont., p. 515, citing cases).

The facts of the transaction at Wood & Miller's law office, too, fasten the effect of misrepresentation upon Draper. The admission too by Draper, that he pointed out a plan in the central area where a line of wells could be drilled, seems to us to account for the belief entertained by the parties and known by Draper to be so entertained by them, that that area was then undrilled.

We think that there can be no serious question in this case that Draper made statements of existing matters, in the respects charged, that were material to the transaction and that were false in substance and in fact; that plaintiffs did not know their falsity, but relied upon their truth and thereby sustained damage. The sole remaining question is whether plaintiffs had the right to so rely.

If they did not have such right to rely, it is because (1), having undertaken to make an inspection and examination they were bound to prosecute it to the end; or (2), they were not authorized to rely upon the statements and representations of defendant; but were bound under the circumstances to inspect and investigate for themselves.

Plaintiffs did go to the lease to see the property. The only one of them all who knew anything of the oil business was Wilson. He says he went as agent for Foster, not here a party. Defendant contends that he was agent for both Foster and Lawall. Since, after Wilson's examination, Foster did not and Lawall did not invest in the property, we are of opinion that Wilson represented Foster alone.

Now, no one could determine by visiting the lease and seeing the wells what the production of the lease with all the wells pumping was, or would be; in other words, what the aggregate

capacity of all the wells then was.   The opportunity for an independent investigation was not open to plaintiffs from an inspection on the ground.   The furnishing of pipe line statements was within the control of defendant and not within the unaided reach of plaintiffs.   From these facts it seems clear that plaintiffs were not compelled to continue an investigation begun, or to begin an investigation, without reference to or any reliance upon the statements of defendant; and this is more particularly the case when, as here, it seems that the opportunity for a full investigation by plaintiffs was interfered with, obstructed and rendered impossible by the active intervention of defendant.   It is not to be forgotten that defendant pressed this transaction to a close before all the wells were even equipped, much less pumped, and that the newest well, the "sand well," was not pumped for want of power after defendant had tested it and knew its capacity.   (See 18 Am. St., 549; 22 Am. St., 407; 25 Am. St., 611; 30 Am. St., 617; 50 Am. St., 824; 32 N. Y., 275-280; 24 Wis., 81-87; 19 Ind., 130, as to the right to rely upon representations of defendant in the absence of plaintiff's actual knowledge or unobstructed opportunity for investigation.)   If an inspection was prevented or its completeness defeated by the acts, arts or words of the seller, the reliance of the purchaser upon the statements of the seller without such investigation or after an incomplete one would be justified (43 Cal., 111; 23 Mich., 99; 31 Mich., 36; 32 Mich., 305; 103 Mass., 501 [as to exent of a patent right] ; 1 Bigelow Fraud, p. 532).   We have no doubt in this case as to plaintiff's right to rely.

If the letter of October 3, from Jones to Draper is considered as evidence of an intent on the part of Jones to defraud his associate purchasers, then Jones' knowledge, if any, that the capacity of this lease was less than forty barrels is not notice to his partners.

"When one member of a firm is committing or consenting to the commission of fraud upon his co-partners, notice on his part is not notice to them" (*Williamson* v. *Barbour,* 9 Ch. D., 505; 2 Pom. Eq. Juris., Secs. 674 and 675).

After Thomas entered into the contract or stipulation of November, with Draper, the former's undisclosed information was

not notice to plaintiffs (53 N. Y., 144; 118 Mass., 147; 135 Mass., 499; 139 Mass., 322). Moreover after November 1, at least, the knowledge, as well as the declarations of Thomas as far as this action is concerned, became the knowledge and declarations of *Draper,* for here a special trust and confidence was reposed in Thomas by plaintiffs as Draper well knew (2 Wheat., 178, 195; 6 Ves., 174, 182; 1 Foub. Equity, *b*—1; *c*—2, 5, 8). If the said letter of October 3, did not relate to an intended fraud on Jones' partners, then it is not evidence that Jones knew what the lease was producing except that he did not know it was producing nearly one hundred barrels. In the latter case assuming, as we believe that Jones relied upon defendant's statements and so relied upon a production of forty barrels and the other matters stated, all the plaintiffs are entitled each in his own right to maintain this action. If, however, Jones undertook to defraud the other purchasers in the transaction, the result is not different. The cash paid did not belong to Jones in whole or part. Stockholders had paid it relying upon the corporation's ownership of this property, and Draper and Thomas knew this, and on November 8 used the fact to close the transaction. The fund should be restored as against Draper and without regard to whether Jones had wrongfully assisted to place it in Draper's hands. The notes signed are executory contracts, and Jones could plead his own fraud known to Draper as a defense to them on suit brought against him by Draper. *In pari delicto, melior est conditio possidentis.* So even as against Jones, Draper would have no right to retain the money or enforce the notes, if Bowler and Lawall, or either, were sought to be defrauded by Jones. True by the concellation of the notes in such case Jones may escape liability. "But equity will not refuse to aid his innocent co-purchasers because of a fraud committed upon them by him. If their rights can not be secured without to some extent releasing him, the innocent must not suffer" (40 O. S., 190-203). The substantive facts warrant full relief to plaintiffs and there is nothing in the procedure in the action to prevent it.

The contract of purchase is decreed to be null and void; the conveyance is rescinded; the money paid, with interest at six per cent. from the date of payment, is ordered to be restored to

plaintiffs; the notes described in the petition are ordered to be surrendered up and canceled, and an account is ordered to be taken of the money expended by plaintiffs in putting the lease in a condition necessary to operate, and for the amount so expended *in full,* together with money expended by plaintiffs in *improvements* on the lease in so far as said *improvements increases the value of the lease* as determined on the account to be taken, plaintiffs are decreed to have a lien upon said leases and property. The part of the purchase price paid in cash, together with interest thereon, is also declared to be a lien upon the property. Costs are adjudged against defendant and execution awarded. If possible, parties may agree upon the master to take and state the account; or if not, the court will appoint.

*Phelps & David,* for plaintiffs in error.

*Jmes O. Troup* and *Beverstock & Donehay,* for defendant in error.