# Staunton.

## J. T. STRICKLAND V. VINA CANTONWINE.

### September 18, 1924.

1. RESCISSION, CANCELLATION AND REFORMATION—*Deeds—Fraud and Deceit—Preponderance of Evidence—Case at Bar.*—The instant case was a suit by complainant to have certain deeds from defendant to her rescinded and to recover from defendant the purchase price paid by complainant to defendant for the property. Complainant was a widow seventy-five years of age and defendant was her physician. The evidence was voluminous, but the preponderance thereof clearly and distinctly proved that the contracts were procured through the misrepresentations and fraud of the defendant as alleged in the bill. Letters from defendant and his employee, when read in the light of the facts as to the real situation, character and value of the lands involved, clearly and unmistakably demonstrated that the whole land selling scheme of defendant, which embraced the sales to the complainant, was fraudulent, and skillfully calculated to entrap such an unwary victim as the complainant.

   *Held:* That the deeds should be rescinded and that complainant should recover the purchase money.

2. EQUITY—*Evidence—Letters of Defendant Discrediting his Testimony.*—In a suit in equity letters from defendant and his employee were at variance with the testimony of the defendant, protesting his good faith and his innocence of misrepresentation; therefore, the chancellor was abundantly justified in disbelieving defendant's testimony upon the material issues in the cause.

3. VENDOR AND PURCHASER—*Rescission—Misrepresentation as to Existing Character and Conditions of the Land.*—A misrepresentation by vendor as to the existing character and condition of the land, if relied upon by the purchaser, that is, if it was the inducing cause of the procurement of the contract of sale, furnishes sufficient ground for the rescission of the contract.

4. VENDOR AND PURCHASER—*Rescission—Misrepresentations—Expressions of Opinion—Case at Bar.*—Misrepresentations as to value and expressions of opinion, such as that the land was worth such and such an amount, that it was "a good investment," that it had "good oil prospects" and the like, as a general rule, even though false, are

regarded as matters of opinion and as not furnishing good ground for the rescission of a contract of sale. Where, however, the parties, as shown by the evidence, are not on an equal footing with reference to the subject of the transaction (as where, as in the instant case, one of them has, or is presumed to have, means of information not equally open to the other), and the party to whom the false representations are made is induced to enter into the contract by reliance on the truth of such representations, such representations, even of such matters of opinion, will be regarded as fraudulent and good ground for rescinding the contract.

5.  VENDOR AND PURCHASER—*Rescission—Representations—Evidence that Buyer did not Rely upon Representations must be Clear and Satisfactory.*—The buyer of property has the right to rely upon representations made by the seller, with reference to the property, which from their nature might induce the buyer to enter into the contract on the faith of them, and evidence of the seller that the purchaser did not rely upon such representations must be of the clearest and most satisfactory character, in order to rebut the inference that the buyer did rely upon such representations.

6.  VENDOR AND PURCHASER—*Rescission—Representations—Ignorance of Vendor.*—Where one, who is reasonably expected to know, makes a positive representation of a material fact, when he is ignorant whether the fact stated is true or untrue, and it turns out to be untrue, causing damage to another, who in good faith relied upon the representation as true, the injured party is entitled to relief.

7.  DEEDS—*Married Woman—Feme Sole—Whether Deed of Woman Vested Legal Title in Grantee—Case at Bar.*—In the instant case the deed of complainant, as sole grantor, to defendant, filed pursuant to the decree of the lower court, was sufficient to reinvest defendant with the legal title to the lands which were conveyed to the complainant by the deeds from the defendant, which were rescinded by such decree, in view of the facts which were material upon the question, as they must be taken to be concluded as against the defendant by the pleadings and proof in the cause. The evidence, at most, taken as the defendant testified he took it, showed affirmatively the pivotal fact that the complainant did not have a husband at the time of the conveyances to her from the defendant, and that her prior marriage relationship was ended long prior to such conveyances. The deeds to her having vested the title to the lands in her as a *feme sole,* the deed from her as a *feme sole* conveyed back to the defendant the legal title.

Appeal from a decree of the Law and Chancery Court of the city of Roanoke. Decree for complainant. Defendant appeals.

*Affirmed.*

This suit in equity was instituted by the appellee, Vina Cantonwine (hereinafter called plaintiff), against the appellant, J. T. Strickland (hereinafter called defendant).    The object of the suit was to have the court rescind two certain deeds from the defendant to the plaintiff conveying to her certain lands in Texas, for the consideration of $1,600.00 cash in hand paid, for one of such conveyances, and $400.00 for the other, by the plaintiff to the defendant, and to obtain a personal decree in favor of the plaintiff against the defendant for such sums of money, aggregating $2,000.00 with interest on the said respective portions from the respective dates of the aforesaid payments thereof.    The ground on which the said relief was sought was that the contracts of purchase and the purchase money paid by the plaintiff for said lands and conveyances were procured by the defendant from the plaintiff by the misrepresentations and fraud alleged in the bill.

Upon the hearing in the court below, upon the bill and exhibits therewith, the answer of the defendant, with general replication thereto, and the depositions of witnesses taken and filed for the plaintiff and defendant, the decree under review was entered; which sustained the prayer of the bill; rescinded the deeds above mentioned; entered judgment in favor of the plaintiff against the defendant for said sum of $2,000.00 with interest thereon until paid, as sought to be recovered as aforesaid; and such decree further provided as follows:

"And it is further adjudged, ordered and decreed that the plaintiff, Vina Cantonwine, do file as a part of

the record of this cause a proper quit claim deed to
J. T. Strickland, properly executed and acknowledged,
to the two tracts of land aforesaid. And thereupon
the plaintiff, Vina Cantonwine, produced and filed
such quit claim deed to J. T. Strickland, to the suffi-
ciency of which deed the defendant objected on the
ground that the husband of Mrs. Cantonwine was not
a party thereto, which objection the court overruled.
Said deed having been inspected by the court and found
to be properly executed and acknowledged, it is ad-
judged, ordered and decreed that said deed be held
by the clerk of this court and delivered to the defend-
ant upon his fully satisfying this decree."

The bill contains the following allegations:

"Humbly complaining, your oratrix, Vina Canton-
wine, respectfully shows unto the court the following
case for equitable jurisdiction and relief:

"That she is a widow and seventy-seven years of
age; that prior to the spring of 1920 she lived in
Oregon City, Oregon; that during her residence in
Oregon City she became acquainted with a man
named Strickland, a brother of the defendant; that
she was frequently in the home of said Strickland and
his family in Oregon City, and the said Strickland often
spoke of his brother who lived in Roanoke, Virginia,
stating that he was a fine physician and one who had
great skill in the practice of his profession; that in the
spring of 1920 complainant visited North Carolina,
and while there became quite sick and recalling how
highly the defendant's brother had spoken of him, she
concluded to come to the city of Roanoke and have
him diagnose her trouble and, if necessary, look after

and care for her as her physician; that acting upon this idea she came to Roanoke and consulted defendant, who told her that she was suffering with high blood pressure and proceeded to treat her for that disorder, and continued the treatment for about one month, for which she paid him the sum of $120.00; that during the course of her visits to the office of the defendant for the purpose of being treated by him, she disclosed to him the fact that she had some money, and he suggested and urged her to deposit same in the Colonial National Bank of this city, wherein the defendant was a director, and upon his advice she opened an account in the presence of the defendant in said bank, who thus found out the amount of money owned by her, being the sum of $2,000.00; that shortly thereafter complainant told the defendant that she thought of buying war saving stamps and liberty bonds with her money, but was strongly advised against this investment being made by her of her money, and defendant told her that he knew of a fine investment he could recommend her to make of her said money, and in that connection advised her that she should invest her money in Texas lands and particularly lands in Brewster county, Texas, and he at that time informed her that he owned some land in Brewster county, Texas, eighty acres of which he proposed to sell her at the price of $20.00 per acre, amounting in all to $1,600.00, and the said defendant represented that the said eighty acres was well worth that amount, to-wit, $1,600.00 or $20.00 per acre, that it was a good investment for her to make, and that the land was located in a good farming section in Brewster county, Texas, and complainant, believing said statements, and each of them, to be true, and being an old woman at the time, to-wit, seventy-five years of age,

with little or no idea of business, and having no advisor whatever and reposing implicit confidence in the defendant, who was her physician and had advised her before from time to time as to what to do with her money and how to invest it, and being very much under his influence and knowing nothing about the property herself and having no opportunity to know anything about it, she agreed to purchase said eighty acres of land, and drew a check for $1,600.00, the consideration therefor, in favor of the defendant, who executed a deed joined in by his wife conveying said property to complainant dated the _____day of May, 1920. A certified copy of said deed is herewith filed marked 'deed No. 1,' and is asked to be read as a part of the bill.

"Complainant avers and charges that each and all of the statements and representations as aforesaid, to-wit, that the eighty acres of land was worth $20.00 per acre, or in the aggregate $1,600.00; that the land was a good investment for complainant and that the land was located in a good farming section of Brewster county, thereby meaning and representing that it was good farming land as well as located in a good farming section, were positive statements of fact made for the purpose of procuring the contract and inducing complainant to pay the consideration aforesaid and accept the deed aforesaid; that they each and all were material representations; that they were untrue and known by defendant to be untrue and false, or not knowing or caring whether they were untrue or what the facts might be, were made by defendant recklessly; that complainant relied upon said statements and representations, and each of them, and was induced thereby to enter into the contract and pay the money and receive the deed aforesaid.

"Complainant further states that shortly after the above transaction the defendant advised her that the climate of the city of Roanoke was not adapted to her constitution and physical troubles and that she should seek a better climate, whereupon she returned to Oregon City, Oregon; that shortly thereafter, defendant, knowing that she had a little more money left after the foregoing transaction with him and that she was an easy mark, wrote her several letters urging her to purchase four acres more of land from him at the price of $400.00, or $100.00 per acre, pretending that he was keeping these lots especially for the complainant; that they were in the best location in that section; that all the lots around these four lots had been sold, and that a great deal of work was being done near the said lots, which he claimed to be holding for the complainant, and that lands were booming in this section of the State of Texas, and that the lands had increased in value since complainant's first purchase; that complainant, still having implicit confidence in the defendant, and relying on the statements and representations made by defendant to her to induce her to enter into the contract of May, 1920, in regard to the eighty acres of land, and relying further on the additional statements and representations made to her in the letters aforesaid, that is that the four acres was more favorably located than any of the other land bought by complainant from defendant; that a great deal of work was being done in the immediate vicinity of said lands, and that all the lots around these four lots had been sold and that lands were booming in this section of the State of Texas and that the value of this property largely increased since her prior purchase, she agreed to purchase said lots and pay the sum of $400.00 therefor, and did pay said sum and received a deed

therefor, * * * a certified copy of which said deed is here filed marked 'exhibit deed No. 2,' and asked to be read as a part of this bill.

"Complainant further states and avers that each and every one of the statements and representations aforesaid, as well as the statements and representations hereinbefore set forth and stated in regard to the transaction of May, 1920, were made for the purpose of procuring the contract and inducing complainant to part with her money and accept said deed; that they were material; that they were untrue, and that complainant relied upon them and was induced by them to enter into the contract and pay her money and accept the deed aforesaid.

"Complainant further states and avers that the land sold and conveyed by defendant to her at the time of said sales was not worth in excess of $2.50 per acre; that instead of being a good investment, as fraudulently represented by defendant, it was, and is, a most disastrous one to complainant's interest; that instead of being good farming land, as represented, the lands lie about fifteen miles from a railroad, is arid and poor and worthless for farming purposes, except when irrigated, and located on a mountain side and can only be reached with extreme difficulty; that there had been no increase in value of the lands at the time defendant induced complainant to make the purchase in December, 1920, and no work had been done in the immediate vicinity of the lots purchased, as falsely represented by defendant, and that there was no boom in lands in that section of Texas, as falsely represented by defendant, and that the four lots last purchased were not more valuable nor more favorably situated than the other lands purchased by complainant, and complainant further states and avers that by means of

false and fraudulent representations made by the defendant to her as aforesaid, and of the confidence she reposed in him, she has been swindled out of well nigh everything that she has, and is left with less than $100.00 outside of this worthless property, with which to maintain herself in her old age and while she is unable to do anything to earn a living.

"Complainant further states and avers that she did not know anything of the fraudulent character of the representations made by the defendant to her as aforesaid, and did not discover the facts in relation thereto until a short while ago, and that as soon as she did discover the facts that she had been overreached and swindled by the defendant, she promptly repudiated the transaction, offered to reconvey to him the lands aforesaid, and demanded the repayment of the purchase price paid by her for said lands, with interest thereon, but defendant refused complainant's offer and refused to pay the amount paid by her for the land, with interest as aforesaid, and coolly stated that if he 'had wanted the land he would have kept it from the beginning.'

"By way of further explanation of the delay that occurred after said transactions were entered into before the same were repudiated by complainant, she states and avers that after said contracts and conveyances as aforesaid, she returned to Oregon, as hereinbefore stated, and afterwards, in 1921, went on a trip to visit relatives in New Hampshire, and afterwards returned to Oregon. That some time after purchasing the lands she informed defendant that she was going to have an abstract of title made to the same, but he advised and dissuaded her from doing so. At one time she spoke of going to Texas to see the land, but defendant advised her strongly against it, and in-

formed her that if she attempted to do such a thing she might be killed by Indians. Defendant paid the taxes on the property for 1920, and when later on the tax ticket was presented for the taxes of 1921, she discovered that the lands were taxed at only eighty cents per acre, but by way of allaying any suspicion on her part, defendant informed her that the taxes were very low in the State of Texas, as compared with the value of property, and so, in one way and another for a considerable time and during nearly all of the year 1921, defendant persistently and studiously prevented complainant from taking steps which would have given her a key and clue to the facts and disclosed to her that she had been imposed upon and defrauded by defendant; that in the fall of 1921, she commenced to make some inquiry and obtain some information by correspondence and otherwise, and later, in 1922, which aroused her suspicion, and finally she came to Roanoke, Virginia, and through her attorney and others obtained additional facts which convinced her that she had been wronged and defrauded as aforesaid, and she thereupon repudiated the transactions and offered to reconvey the property to defendant and begged him to permit her to do so upon payment of the price she had paid for the land, but defendant, as hereinbefore stated, refused to do anything to correct the wrong and injury that he had perpetrated against this complainant.

"Complainant here states that she is willing and ready to reconvey the lands heretofore conveyed by defendant to her, and herewith files deed marked 'exhibit deed,' in due form, conveying the same, which she asks to be held subject to the determination of the issues involved in this cause."

The answer of the defendant contains the following allegations:

"That it is true, as alleged in said bill, that the complainant did purchase from respondent and respondent conveyed to her two tracts of land in Brewster county, Texas, one tract of land sold by respondent to complainant consisting of eighty (80) acres in section 104, at the price of $20.00 per acre, and the other tract sold by respondent to complainant consisting of twenty (20) acres in section 118, at the price of $20.00 per acre.

"Respondent avers that the facts in relation to his acquaintance with complainant and the sale of the land to her are as follows:

"Complainant, about five or six years ago, came into respondent's office in the city of Roanoke, Virginia, with a man from North Carolina named Hamilton. She informed respondent that she knew a man named Strickland in Oregon City, Oregon, and seeing his name, she wondered if he was related to him or knew him. The man with complainant named Hamilton said that he was acquainted with respondent in North Carolina and that he had a brother who worked for respondent for several years. The visit of complainant and this man Hamilton to your respondent was purely of a social nature and when they left respondent's private office, complainant shortly thereafter returned alone and told respondent that although she had known Hamilton only a few days she believed that she would marry him. She further told respondent that she had some money and she thought that Hamilton might want to get her money. A short time thereafter complainant came back to respondent's office and informed respondent that she had married Hamilton.

"For a considerable length of time after the last mentioned visit of complainant and thereafter, to-wit, in the early part of the year 1918, complainant came to respondent's office and said that she had separated from

Hamilton and that he had gotten a lot of her money away from her. She also said that she had some notes and mortgages, representing money loaned by her to people in North Carolina, and that she wanted the money kept out of this State to keep Hamilton from getting it away from her, and she asked respondent to advise her about the collection and handling of the money represented by these notes and mortgages. Respondent advised her to turn the notes and mortgages over to E. W. Tinsley, of the Colonial Bank, and went with her to see Mr. Tinsley and requested him to give her matters the necessary attention and issue certificates of deposit to her for the money collected so that she would get interest on it from the time it was collected.

"In June of 1918 the complainant was taken sick and respondent treated her professionally during June, July and August of that year. Shortly thereafter complainant left the city of Roanoke and respondent did not see her again until she came back to Roanoke in the spring of 1920. When complainant returned to Roanoke in 1920, she came to respondent's office a number of times, but her visits were purely social, and respondent did not prescribe for complainant or deal with her in any professional capacity whatsoever.

"In January, 1920, respondent bought fifteen (15) sections of land in Brewster county, Texas. The purchase of this land was negotiated through C. C. Manning and W. S. Amburgey, and respondent entered into an arrangement with them under which they were to handle and dispose of the land and after the repayment to respondent of the purchase money advanced by respondent to pay for the land and other expenses incident to the purchase and sale of the land, the said Manning and Amburgey were to receive an interest in the profits derived from the sale of the land. Respondent

had not seen this land when it was purchased by him, and in fact, has not yet seen the land, respondent relying solely upon the judgment of the said Manning who had examined the land as to its character and value. After the purchase of the Texas land as aforesaid, the said Manning and Amburgey placed the same on the market, divided the land up and commenced selling it in five acre tracts. In handling the sale of this land, the said Manning and Amburgey used respondent's reception room or office as their office, from which they conducted the correspondence and transacted the business in connection with the sale of the land.

"Respondent never mentioned this land to complainant and never tried to interest her in the purchase of the land, although complainant had been to respondent's office a number of times. Some time in May, 1920, respondent was informed by Miss Vivian Shumate, his clerk or office assistant, that complainant had said to her that she (complainant) had $2,000.00 in money * * * and that she wanted to invest it; that Miss Shumate suggested to her to buy some of this Texas land that they were selling. Thereupon respondent told Miss Shumate that he did not care to sell any land to complainant. Within a day or two thereafter complainant came into the office of respondent and there found C. C. Manning and W. S. Amburgey, who were then engaged in selling the Texas land, and complainant informed them that she wanted to invest $2,000.00 in this land. Thereupon C. C. Manning entered into a contract with the complainant, selling her the land. Then the complainant, with the said Manning, the said Amburgey and Miss Shumate, came into respondent's private office and told respondent about the transaction and respondent suggested to complainant that instead of buying all of the land in section 104,

which she had contracted for, that she only buy a portion in that section and that respondent would advise her later about buying the balance of the land in another section. It was then agreed that she should take sixteen (16) tracts of five (5) acres each in section 104, at $1,600.00, and that she would buy the additional $400.00 worth of land in another section at such time as respondent thought best for her to buy it.

"Thereafter, during the latter part of the year 1920, respondent wrote complainant several letters advising her to buy the additional $400.00 worth of land in section 118. Complainant then closed the contract for twenty (20) acres of land in section 118 at the price of $20.00 per acre. Respondent advised complainant to buy the additional land in section 118 because respondent had learned through Manning, who had examined the land, that the land in that section was more valuable than the land in section 104.    *    *    *

"Respondent further avers that none of the land in the two sections in which complainant's tracts are located has been sold for less than $20.00 an acre and that only several large parcels of the land bought by respondent in Brewster county, Texas, has been sold for less than $20.00 an acre, that amount being the price placed on all of said land owned by complainant in said county, except where a large acreage has been sold to one purchaser there has been a reduction in the price.

"Respondent, as hereinbefore alleged, has never seen the land purchased by complainant as aforesaid in Brewster county, Texas, and made no representations to complainant, or any one else, as to the character and value of the land. Respondent denies that he found out that complainant had $2,000.00 in the bank and shortly thereafter advised her as to investments, but

on the contrary avers that it was nearly two years after he took *complainant* to the bank and requested Mr. Tinsley to look after the collection of her notes and mortgages for her when she made the purchase of the Texas lands from respondent.

"Respondent denies all allegations contained in complainant's bill of complaint except such as are herein specifically admitted to be true.    *    *"

The evidence in behalf of the plaintiff consisted of exhibits Nos. 1 and 2 with the bill; her own deposition; a large number of letters written to her by the defendant and his employee, Mr. Manning, during the period from June 12, 1920, to July 7, 1921; and the depositions of three Texas witnesses well and long acquainted with the land in question and its true value.

The evidence in behalf of the defendant consisted of his own deposition and the depositions of his employees, Manning, Mrs. Manning, Amburgey, and Miss Shumate.

The evidence is too voluminous to admit of its being set out in detail.    It is deemed sufficient here to say of it that the testimony of and for the plaintiff, if credible, fully sustains all of the allegations of the bill— except that the second purchase aforesaid is shown by such evidence to have been of twenty, instead of four, acres of land, as alleged in the bill; and that while the testimony of and for the defendant, if credible, sustains the allegations of the answer in many particulars, it distinctly fails to sustain the allegations of the answer in two vital particulars, namely: the allegations, in substance, of the answer, (1) that the plaintiff entered into a completed contract of purchase "with C. C. Manning" at the time of her first purchase of the land, before she came into the defendant's office and talked with him about the transaction; and (2) that the plaintiff relied

upon information obtained by looking at the maps and upon her own judgment, in making the first purchase, and not upon any representations of the defendant. As to the first of these particulars, the testimony of and for the defendant itself shows that the plaintiff had not concluded any contract binding upon her or the defendant until after she came into the office of the defendant and talked with him about the matter. And as to the second of these particulars, the circumstances of the age of the plaintiff and that the subject of the contract was land in a far-away State, of which land the plaintiff herself knew nothing; of which the maps could give the plaintiff no real information; of which none of defendant's agents testify that they gave her any information, other than that it was land which the defendant owned and had for sale; repel the inference that she relied upon information derived from the maps and her own judgment in making the first purchase. Then, too, the letters of the defendant and of Mrs. Manning, in evidence, are to be read in considering the credibility of the testimony of the defendant as compared with that of the plaintiff. The following are extracts from some of such letters:

On June 21, 1920, defendant wrote plaintiff: "The outlook is great for your Texas land."

On June 29, 1920, Mrs. Manning wrote plaintiff: "Now we have four lots picked out for you and want you to get in this section, as these lots are very close to that big Wilson well in Brewster county that we are looking every day to come in a big gusher. The last report we had on this well was that the well was standing 1,000 feet in oil. We will keep these lots for you until we hear from you. You can write the check to Dr. J. T. S. and we will send you the deed," etc.

On August 18, 1920, she wrote: "I do hope that you will get your check in real soon as things are looking fine down in Texas, at this time, and then, too, prices may go soaring at any time and you want to get all of this land that you possibly can.    Doctor says that he wants you to send him a check for at least four lots, as he has them picked out for you and have been saving them for you for nearly a month, he could have sold them, but would not as he kept them for you— they are in a good location and want you to have this plat of land."

On October 11, 1920, she wrote:   "Well, the oil business is still booming and you had better send us a check for about five more tracts or more as we will not have much land left in a few more weeks, as the boys are selling it so fast we can hardly keep up with them. You had better send in right away so we can fix you up with these lots that Doctor is holding for you," etc.

On October 20, 1920, defendant wrote plaintiff: "The land you bought is going to be very valuable.    You just hold it and it will increase in value every year.    It is a good purchase for you and will always be valuable."

On October 21, 1920, he wrote plaintiff:   "Things are looking good in Texas and I expect to get down there the latter part of this year and I will write you all that I can find out while there."

On November 1, 1920, he wrote:   "These lots that I am keeping for you will cost you $400.00, as they are in the best location in this section and all are sold around them but these four that I have been keeping for you, now you send me check on the Colonial Bank, if you still have your money there, for $400.00, if you haven't it there, on any other bank you have money in.    I am enclosing a check for your convenience and all you have to do is to sign it and I will at once send deed.    The

word recently came to me that *they are doing great work near the lots I am holding for you.*"

On November 6, 1920, he wrote: "The land is said to be rich, fertile land for agricultural purposes and it has a good chance for oil. Oil has been found in many places in Brewster county and values are getting to be higher."

On December 9, 1920, he wrote: "You had better sign that check for $400.00 I sent you and mail it to me at once or if you have thrown it away, write another one on the Colonial National Bank of Roanoke. I am saving these lots for you so try to get them. They are in the best place of any of the ground and things are booming down there now."

After some remarks about the land plaintiff had already bought, the letter of December 10, 1920, from defendant to plaintiff, says: "If you care to buy any more, please let me know at once and I will be glad to select for you what you want as near a development for oil as I can. I do not want to persuade you to buy any more if you feel that you do not want it, yet the tract we will select now would at least double your chances to be independent for life by spending very little money."

On December 20, 1920, he wrote: "I have those four lots and will keep them for you. I wish you would send in the check as soon as you can and get your deed on record as things are looking mighty fine down there now."

*Hall, Wingfield & Apperson* and *Paul C. Buford,* for the appellant.

*Jackson & Henson* and *A. L. Hughson,* for the appellee.

SIMS, P., after making the foregoing statement, delivered the following opinion of the court:

There are but two questions presented for decision by the assignments of error, which will be disposed of in their order as stated below.

[1, 2] 1. Does the preponderance of the evidence clearly and distinctly prove the misrepresentations and fraud and the procurement thereby of the two contracts of purchase and the purchase money from the plaintiff by the defendant, as alleged in the bill?

The question must be answered in the affirmative.

To our minds, the letters from the defendant and his employee, Mrs. Manning, when read in the light of the facts as to the real situation, character and value of the lands involved, as shown by the uncontroverted testimony of the witnesses for the plaintiff, clearly and unmistakably demonstrate that the whole Texas land selling scheme of the defendant, which embraced both sales to the plaintiff, was fraudulent, and skillfully calculated to entrap just such an unwary victim as the plaintiff. Further: These letters are so at variance with the testimony of the defendant, protesting his good faith and his innocence of misrepresentation, that we are of opinion that the learned chancellor who entered the decree under review was abundantly justified in disbelieving his testimony upon the material issues in the cause. Moreover, the testimony of the witnesses for the defendant broke down in the attempt to show that the plaintiff entered into a binding contract for her first purchase before she had the talk with the defendant concerning it. And the testimony of and for the defendant practically sets up no defense to rebut the fraud shown by the plaintiff's evidence as having induced her second purchase of land, other than the un-

sustained position that it was but a part of her first purchase, the consummation of which was merely deferred at the suggestion of the defendant, as claimed by him. And finally, the age and situation of the plaintiff, as disclosed by her testimony and also by the testimony of and for the defendant, and the very character of the testimony of the plaintiff, as it appears in her deposition, are all so corroborative of the truth of her testimony upon the material issues, that we are convinced that the conclusion we have reached above—which is the same as that embodied in the decree under review—is correct.

[3] Among the misrepresentations proved in the instant case is the misrepresentation as to the existing character and condition of the land. All the authorities agree that such a misrepresentation, if relied upon—that is to say, if it was the inducing cause of the procurement of the contract in question—will furnish sufficient ground for the rescission of the contract.

[4] There were also, in the instant case, other misrepresentations as to value and expressions of opinion, such as that the land was worth such and such an amount, that it was "a good investment," that it had "good oil prospects" and the like. As a general rule, such representations, even though false, are regarded as matters of opinion and as not furnishing good ground for the rescission of a contract. Where, however, the parties, as shown by the evidence, are not on an equal footing with reference to the subject of the transaction (as where, as in the instant case, one of them has or is presumed to have means of information not equally open to the other), and the party to whom the false representations are made is induced to enter into the contract by reliance on the truth of such representations, such representations, even of such matters of

opinion, will be regarded as fraudulent and good ground for rescinding the contract.   26 C. J. 1154, 1158; 12 R. C. L. 381; *Grim* v. *Byrd,* 32 Gratt. (73 Va.) 293; *Fitzgerald* v. *Frankel,* 109 Va. 603, 64 S. E. 941; *Cerriglio* v. *Pettit,* 113 Va. 553, 75 S. E. 303.

[5] Moreover, in such case it is settled, that the buyer of property has the right to rely upon representations made by the seller with reference to the property which from their nature might induce the buyer to enter into the contract on the faith of them, and evidence of the seller, that the purchaser did not rely upon such representations, must be of the clearest and most satisfactory character in order to rebut the inference that the buyer did rely upon such representations.   *Wilson* v. *Carpenter,* 91 Va. 183, 21 S. E. 243, 50 Am. St. Rep. 824; *Fitzgerald* v. *Frankel, supra* (109 Va. 603, 64 S. E. 941).

[6] The defendant claims in his deposition that he had never seen the land; did not himself know its character and condition.   But this fact, if true, can avail him nothing.   Where one, who is reasonably expected to know, makes a positive representation of a material fact, when he is ignorant whether the fact is true or untrue, and it turns out to be untrue, causing damage to another who in good faith relied upon the representation as true, the injured party is entitled to relief.   *Grim* v. *Byrd, supra* (32 Gratt. [73 Va.] 295); *Wilson* v. *Carpenter, supra* (91 Va. 183, 21 S. E. 243, 50 Am. St. Rep. 824); *Spoor* v. *Tilson,* 97 Va. 279, 33 S. E. 609; *Lowe* v. *Trundle,* 78 Va. 65; *Jordan* v. *Walker,* 115 Va. 109, 78 S. E. 643; *Bradley* v. *Tolson,* 117 Va. 467, 85 S. E. 466.

[7] 2. Is the deed of the plaintiff, as sole grantor, to the defendant, filed pursuant to the decree under review, sufficient to reinvest the defendant with the legal title to the lands which were conveyed to the plaintiff

by the deeds from the defendant, which are rescinded by such decree, in view of the facts which are material upon this question, as they must be taken to be concluded as against the defendant by the pleadings and proof in this cause?

The question must be answered in the affirmative.

The answer alleges that the plaintiff informed respondent, before the first purchase of land involved in this cause was made, "that she had married Hamilton," a man who accompanied her on a previous visit of the plaintiff to the defendant. The defendant in his deposition testifies to the same fact, but adds that the plaintiff, at the same time, told him that "she had gotten rid of him." That, according to the defendant's testimony, was in 1918, two years before the first deed involved in this cause was made by the defendant to the plaintiff.

On the cross-examination of the plaintiff she was asked and answered the following questions on the subject of Hamilton and her relations with him at the time of her first and second visits to the defendant, both being prior to the time the deeds involved in this suit were made:

"Q. And you went to Dr. Strickland's office to see him?

"A. Yes, sir.

"Q. You went there with the man you expected to marry?

"A. With a man named Hamilton.

\*       \*       \*       \*       \*       \*       \*       \*       \*

"Q. You did marry this man Hamilton?

"A. Yes.

\*       \*       \*       \*       \*       \*       \*       \*       \*

"Q. When did you come back to Roanoke again?

"A. After I got rid of Hamilton   \*   \*."

"Q. After you got rid of Hamilton you came to Roanoke again?

"A. Yes, sir; after a good little bit."

There is in evidence (by whom introduced does not expressly appear in the record before us, so far as we have found, although it does appear that the defendant was questioned about it, on cross-examination, for a different purpose and upon a different subject altogether from the subject under consideration), the check which the plaintiff gave the defendant for the $400.00 consideration for her second purchase of land from him, which, as it is copied in the record, is as follows:

"Roanoke, Va., November 1, 1920.

"Colonial Bank and Trust Company,

"Pay to the order of J. T. Strickland_____$ 400.00

"Four Hundred_____Dollars

"Vina Cantonwine,

"Chg. Acct. Vina C. Hamilton."

Whether the words "chg. acct. Vina C. Hamilton," appearing under the signature of the plaintiff, were written by her, or were entered as a memorandum by some official of the bank, does not appear in evidence.

The above mentioned evidence is all of the evidence which appears in the record on the subject of the facts under consideration. It was introduced in pleading and in proof altogether by the defendant, with the exception perhaps of the check mentioned. At most, taken as the defendant testified he took it—at its unquestioned face value—such evidence showed affirmatively the pivotal fact that the plaintiff did not have a husband at the time of the conveyance to her from the defendant—that her prior marriage relationship men-

tioned was ended long prior to the time of such conveyances.

As the defendant introduced this evidence as showing the facts on the subject, which the plaintiff did not controvert, there was no duty resting upon the plaintiff to take any issue thereon, or to introduce any further evidence on the subject. Hence we must consider that the pivotal fact aforesaid must be taken as concluded as aforesaid, as against the defendant, by the pleadings and proof on the subject.

Such being the fact, it is, of course, obvious that the deeds from the defendant to the plaintiff vested no interest whatsoever in any husband of the plaintiff.

The deeds to her having vested the title to the lands in her as a *feme sole,* the deed from her as a *feme sole* has conveyed back to the defendant the legal title which he conveyed to her.

Such being our conclusion, it becomes unnecessary for us to deal with the question whether in such a case as this (where the lands are in another State) the well settled rule, that where a deed is rescinded for fraud it is abrogated, not partially but completely, and puts an end to all dower or curtesy rights derived thereunder, is or is not applicable.

The decree under review will be affirmed.

*Affirmed.*