# Wytheville

T. W. Edmunds, Mrs. Sallie D. Edmunds, His Wife, and Edmunds Hospital, Inc. v. Rice Gwynn.

June 18, 1931.

Present, Prentis, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

On rehearing, Richmond, January 14, 1932.

Present, Campbell, C. J., and Holt, Epes and Hudgins, JJ.

The opinion states the case.

*Harris, Harvey & Brown,* for the appellants.

*Aiken, Benton & Bustard* and *John W. Carter, Jr.*, for the appellee.

HUDGINS, J., delivered the opinion of the court.

Complainants filed their bill to compel the vendee to specifically perform an auction sale contract of certain lots and buildings. The respondent answered and filed a cross bill praying that the contract be cancelled and the cash payment of ten per cent on the purchase price be refunded him. From a decree granting the prayer of the cross bill complainants appealed.

The appellants owned five lots, with buildings thereon, fronting on West Main street in the city of Danville. Three of the lots, known as the Edmunds Hospital, the Moorefield House and the Nurses' Home, were located on the north side of the street, and the other lots, called the Herman Home and the Hodges House, were located on the south side of the street, facing the other property. The three lots on the north side of Main street were formerly used in connection with the Edmunds Hospital, but on the day of the sale were vacant, and had been for some time prior thereto.

The owners, desiring to sell the five lots, employed for that purpose the Ben Temple Land Company, a well-known real estate concern that specialized in selling real estate at public auction. The property after being extensively advertised was exposed for sale at public auction in April, 1929. The terms of sale were ten per cent cash, balance to be paid in instalments extending over a period of twelve years, and to be secured by a deed of trust. The parties acting for the selling company on the day of sale were Ben Temple, the auctioneer, who stood on a truck on the street in front of the property, a clerk, L. B. Handy, and three others called "ground men." The duty of the ground men was to obtain bids on the property from those in at-

tendance and notify the auctioneer when they were success-
ful in so doing. Sometimes the bidders communicated their
bids directly to the auctioneer and sometimes through the
ground men.

The appellee informed the auctioneer before the sale that
he was interested in the three pieces of property on the north
side of the street. The auctioneer stated to him that in that
event he would first offer these three parcels separately and
then together, with the right to accept the highest bid.
This method of offering the property was publicly announced.
After the three pieces had been offered separately, announce-
ment was made that the combined bids totalled $40,750.00
and that bidding on them as a whole would start at those
figures. The appellee bid $41,000.00, the property was cried
out to him at that price, he signed the memorandum of sale
and paid $4,100.00, the required ten per cent, in cash.

The appellee relies upon the following circumstances to
show fraud: The Herman House was cried out to a Mr.
Lewis for $12,000.00. He signed the memorandum of sale
and gave his check for $1,200.00, but either during the
sale or immediately thereafter, with the consent of Dr.
Edmunds, the check and memorandum were returned to
him. Dr. Edmunds testified that the price of the property
was less than he desired and Mr. Lewis was willing to
withdraw his offer. There was no sale of this property.
Apparently this transaction was *bona fide*.

When the Hodges lot was offered for sale Julius F. Baum
made several bids, his highest and last bid was $8,000.00.
The auctioneer continued to cry the property and as Baum
was leaving the place of sale it was being cried at $11,000.00,
and later he heard that it was knocked out to him at that
price. As soon as the hammer fell on this lot a ground
man reported to the auctioneer that it was no sale and
the auctioneer "immediately forgot it." Dr. Edmunds

and the auctioneer said that there was some mistake about this bidding, but exactly how it occurred they could not say.

Some time after the sale, one of the attorneys employed by the appellee asked the auctioneer, Ben Temple, to give him the names of the parties who had bid upon the three pieces of property separately, stating that he desired to interest them, if possible, in purchasing the property from Mr. Gwynn; to which it is claimed the auctioneer replied that it was useless for him to try to find them, that "whoever bid was simply bidding to protect Dr. Edmunds." The auctioneer denied making this statement, but said he could not remember the names of any of the bidders on the three pieces of property except R. A. James, Jr., and could not recall the amount of his bid nor for which piece of property he was bidding. No memorandum of agreement was signed by any of the parties who made separate bids, and neither the clerk nor the ground men were introduced as witnesses for either side. These facts suggest the effect fictitious bidding has upon an auction sale.

It seems that no cases involving puffing or by-bidding at auction sales have in recent years been decided by this court, although the question has been the subject of much litigation in the other States and in England. Two of the early Virginia decisions deal with the subject. The facts in the case of *Hinde* v. *Pendleton* (1799), Wythe 354, were that a by-bidder employed by the auctioneer, without specific authority from the seller, bid on the property offered for sale and thereby caused it to bring more than its true value. The court held that the fictitious bids constituted a fraud upon the real bidder and reduced the price of the property to its actual value as ascertained by the commissioner.

Judge Staples rendered the opinion in the other case of *Brock* v. *Rice* (1876), 27 Gratt. (68 Va.) 812, where a judicial

sale was set aside because the auctioneer bought the property, claiming to be the agent of a person who was not present. It was said that no person employed or concerned in selling property at a judicial sale should be permitted to become the purchaser, or the agent for one desiring to purchase; that it was the duty of the seller and his employees to obtain honestly the best price possible for the property and if he was interested in purchasing it for himself, or another, his interest and duty alike would prompt him to obtain the property upon more advantageous terms, and there was an irreconcilable conflict between the two positions.

The owner of property has a right to offer it for sale upon such terms, conditions and restrictions as he may elect. When, however, he elects to advertise it for sale at public auction to the highest bidder it is an invitation to all persons to attend and bid therefor on equal terms and is equivalent to a public statement on the seller's part that the sale will be conducted openly, fairly and in good faith toward all parties.

The general rule in the United States Court, and in the majority of the State courts, is that unless the right is reserved in the seller to bid, fictitious bidding by the auctioneer or by any other person acting on behalf of the seller is a fraud on *bona fide* bidders. *Veazie* v. *Williams*, 8 How. 134, 12 L. Ed. 1018; *McMillan* v. *Harris*, 110 Ga. 72, 35 S. E. 334, 48 L. R. A. 345, 78 Am. St. Rep. 93; *Osborn* v. *Apperson Lodge*, 213 Ky. 533, 281 S. W. 500, 46 A. L. R. 117; note in 131 Am. St. Rep. 479, at page 488; *Curtis* v. *Aspinwall*, 114 Mass. 187, 19 Am. Rep. 332; *Peck* v. *List*, 23 W. Va. 338, 48 Am. Rep. 398; 2 R. C. L. 1128; 6 C. J. 833.

As opposed to this rule, it has been said that the property may be sacrificed for want of bidders. The answer to this objection is that the owner may set a specific sum, less than which he will not take, or he may reserve the right and

publicly announce that he will bid on the property himself. Strictly speaking, a seller offering to buy his own property occupies an anomalous position. In such a case, however, there is no concealment and the bidders know exactly what to expect. "The whole and the real truth should be stated when the property is offered for sale." *Towle* v. *Leavitt*, 23 N. H. 360, 55 Am. Dec. 195; *Bowman* v. *McClenahan*, 20 App. Div. 346, 46 N. Y. S. 945; *Latham's Exrs.* v. *Morrow*, 6 B. Mon. (Ky.) 630; *Jenkins* v. *Hogg*, 2 Tread. Const. (S. C.) 821; *Reynolds* v. *Dechaums*, 24 Tex. 174, 76 Am. Dec. 101; 2 R. C. L. 1131.

One of the difficulties this case presents is raised by the following testimony: The auctioneer, within a day or two after the sale, went to see the appellee, Rice Gwynn, for the purpose of ascertaining just how he desired the deed transferring the property and the deed of trust securing the unpaid purchase price to be prepared. During this interview, Mr. Gwynn told him that he had examined the property before the sale and had bought it cheaper than he had expected. About that time Mrs. Gwynn came into the room and requested Mr. Temple to get Dr. Edmunds to let her husband out of the sale and that Mr. Gwynn said: "When I buy anything I buy it, and I don't want anybody to take it back."

This evidence is not denied, Mr. Gwynn was not called as a witness, and no attempt was made to meet the situation presented by it. The only inference that can be drawn is that Mr. Gwynn was thoroughly familiar with the property in question; that he had made up his mind before the sale what price he was willing to pay, and that he bought it at the sale cheaper than he had anticipated.

If we assume that there was no mistake, but there was fictitious bidding, on the Hodges lot, the above evidence clearly establishes the fact that it did not influence the appellee in bidding on the three pieces of property.

One of the cases cited and relied upon by the appellee is

*Curtis* v. *Aspinwall*, 114 Mass. 187, 19 Am. Rep. 332, where
it is said that the ground upon which by-bidding at auction
invalidates the sale is that a fraud is practiced upon the
purchaser, and that in such a case the burden of proof is
upon the party alleging it not only to prove the fraud, but
that he was influenced or damaged by it; that there is a
presumption that real bidders upon the property are in-
fluenced and misled by secret by-bidding. "But this pre-
sumption may be rebutted. If the by-bidding had no effect
or influence upon the purchaser's bid, the latter cannot
avoid his contract. As in other cases where deceit or fraud
is used in a sale, the purchaser cannot avoid it if he was not
induced or influenced by the fraud to enter into the con-
tract."

The appellee relies upon a number of Virginia cases holding
that this court will not reverse the trial court upon issues of
fact unless the finding is against the preponderance of evi-
dence, or without substantial evidence to support it. The
trial court in the instant case rendered two opinions. In
the first he granted the relief prayedf or by the appellants,
and in the second he reversed himself and denied relief to
the appellants and granted it to the appellee. This shows
not only the conscientiousness of the chancellor in the court
below, but also that he had decided doubts as to the correct-
ness of his conclusion. We appreciate his difficulty. The
case does not present one of determining the credibility
of witnesses or a close question of disputed fact. The ques-
tion is, were fraud and misrepresentation to be presumed
against Dr. Edmunds because of the inability of his agent,
Temple, to remember the names of the persons who made the
separate bids on the three pieces of property? Dr. Edmunds
states positively that he had no by-bidders and knew nothing
about any such bids. Mr. Temple is likewise emphatic in
stating that he knew of no by-bidding. In its final analysis,
the court is asked to cancel a contract on the ground of

Temple's failure to remember the names of the bidders and the contradicted statement that he said "whoever was bidding was simply protecting Dr. Edmunds."

We are cited by the appellee to the case of *Strickland* v. *Cantonwine*, 140 Va. 193, 124 S. E. 292, and other Virginia cases which hold that a buyer of property has a right to rely upon representations made by the seller which are calculated to induce the buyer to enter into a contract on the faith of them. When such is the case and the seller claims that the purchaser did not rely upon the representations, the burden is upon him to prove by clear and satisfactory evidence that the buyer was not misled thereby.

This rule has no application to the case at bar because the record shows by uncontradicted testimony that the buyer stated in positive terms that he made up his mind prior to the day of the sale the amount he was willing to pay for the property and bought it at a smaller figure. If we assume that there was by-bidding on the property and that by reason of that fact the buyer paid more for the property than he otherwise would have done, the inference is undoubted that he has been misled. In this case, however, the appellee is asking the aid of a court of equity to cancel a contract of sale on the ground of fraud, and the rule is that the proof of fraud must be clear and convincing, and such as to satisfy the conscience of the chancellor, who should be cautious not to lend too ready an ear to the charge. *Redwood* v. *Rogers*, 105 Va. 155, 53 S. E. 6; *Hutcheson* v. *Savings Bank*, 129 Va. 281, 105 S. E. 677.

The proof of fraud in the present case fails to measure up to this rule. There is no proof, but only an inference, that the appellee relied upon the alleged fraud. There is no proof, but only an inference, that he has been injured, as no evidence was introduced showing the value of the property. There is no proof, but only an inference, that the appellee was influenced or misled by anything that happened at

the sale. There is positive and uncontradicted evidence showing that he was present during the entire sale and was an active participant therein, that he examined the property before the sale, exercised his own judgment as to its value and bought it under the sum he thought it was worth. He did not avail himself of the opportunity to take the witness stand and inform the court how and under what circumstances he was misled or injured. There was error in granting the relief prayed for in the cross bill.

The appellee further contends that the complainants did not tender a marketable title to the property, and as a basis for this claim states that there was a wrongful dissolution of the corporation known as the Edmunds Hospital, Incorporated, because the State Corporation Commission entered an order of dissolution upon an order purporting to be by unanimous consent of all the stockholders, and as a matter of fact those signing did not own all of the stock. The chancellor correctly held that the appellee had failed to prove this fact. Even if this finding on the question of fact were not sufficient, the minutes of the stockholders and directors show that on February 12, 1927, all of the stock of the corporation was represented and a sale of the property in the manner prescribed was authorized. The correctness of the minutes was not attacked. It follows that even though all of the stockholders did not consent to the dissolution, the sale of the property was duly authorized by the corporation.

For the reasons stated, the decree complained of is reversed, and the cause remanded to the lower court with direction to enter a decree directing specific performance of the contract of sale set out in appellants' bill.

Note—Accordingly, on the first hearing the case was ordered to be reversed and remanded; Prentis, C. J., and Epes, J., dissenting.

ON REHEARING.

## Richmond

January 14, 1932.

Present, Campbell, C. J., and Holt, Epes and Hudgins, JJ.

HOLT, J., delivered the opinion of the court.

This cause, which is reported in *ante*, page 528, 159 S. E. 206, is not free from difficulty. The chancellor who presided at its trial was first of opinion that the plaintiffs should prevail, but upon more mature reflection reached the conclusion that he was in error, held with the defendant, and granted the prayer of his cross bill. That decree was reversed by this court, two justices dissenting. In the majority opinion the justice now drafting this on rehearing concurred.

The major issue is, was there fraud in the auction sale brought about through puffing or by-bidding? Mr. Temple, the auctioneer, is a man of wide experience, as were his clerk and three "ground men." Their duty was to excite interest among possible bidders, and, in the language of Mr. Temple: "They know their job is not let the man bidding get away from them." The three lots bought by Gwynn lie on the north side of Main street in the city of Danville. In accordance with plans announced they were first offered separately and then as a whole. If the gross bid should exceed the aggregate amount of the separate bids it was to be accepted. Otherwise the separate bids were to hold. When separate bidding was at an end the auctioneer announced that they aggregated $40,750.00, thereupon Mr. Gwynn bid for them as a whole $41,000.00. There was no other bid and they were sold to him.

Temple's evidence is:

"Q. When Mr. Gwynn bid $41,000.00 on the whole, he did it upon the representation that the three pieces had been knocked out at $40,750.00 as a total?

"A. That is right.

"Q. Can you tell us of any bid that was received from

anyone up there besides Mr. Gywnn who wanted the property?

"A. As far as I known all that were received were from people who wanted the property.

"Q. Can you give us the name of a single Danville man who bid on any of that property and what his bid was besides Mr. Gwynn?

"A. I cannot on these three pieces."

He does elsewhere say that a Mr. James bid on one or more of these lots but he does not undertake to say what were his bids or that any sales were actually made to him.

Judge Aiken, acting for Mr. Gwynn, went to see Temple. His testimony is:

"According to the best of my recollection, later on that same day, I met Mr. Temple just at the entrance of my office, his office being just a few doors from mine, and he spoke to me and asked me what was the information we wanted about the auction sale. I told him that we wanted the names of the persons who bid on the property, in the hope that we could interest them in relieving Mr. Gwynn of it, and asked him to give me the names. He said it was no use for me to try to find them or see them. I asked him why not. He said: 'Well whoever bid was simply bidding to protect Dr. Edmunds.' I asked him if he meant by this they were bidding without any serious intention of becoming purchasers. He said words to this effect: 'Oh, well, you know how these things are, they were just trying to protect Dr. Edmunds.' He never did give me the names."

Miss Mitchell, an employee of Judge Aiken's law firm, in reply to a question by that gentleman, said:

"Well, I was sitting there typing, and Mr. Temple asked you something about the Edmunds transaction. He had been in several times asking about it. I think he asked you about a letter you had written Mr. Harris the day before. I believe he wanted to know what you wanted to know from

Mr. Harris, and you told him you wanted to know the names of some of the bidders of the Edmunds property, so that you could get them to take it off of Mr. Gwynn's hands. I don't recall exactly what the words were he said, but he said they were bidding to protect Dr. Edmunds."

These statements are denied by Mr. Temple. He is deeply interested in this litigation. He is charged with fraud. Judge Aiken has no interest beyond that as counsel for Mr. Gwynn, and Miss Mitchell has no interest at all. Mr. Temple admits that he knows almost everybody in Danville. He says that his experienced ground men are charged with the duty of not letting any bidder get away, and it was the duty of Mr. Handy, the clerk, to make memoranda of what was done. He did not testify, but on the day on which final judgment was entered filed an affidavit. He could recall the name of no bidder, and in it said:

"I, therefore, did not make any inquiry at that immediate moment as to who the purchasers of the separate parcels were but waited until the property as whole was purchased by Mr. Gwynn when I presented to him the contract and closed up that sale. Had I done otherwise, I would have had to go to each one of the separate purchasers and have him sign a contract, receive his deposit and then when the property was sold as a whole I would have had to undo the contract, and deliver the deposit back. In other words, I did not think it was required or expected that a memorandum of sale would be signed until the sale was a final one." This is not evidence and was offered *in extremis*.

Here are five men, experienced specialists, two of whom knew the people of Danville, and yet not one of them is able or willing to give us the name of a single purchaser of property which sold for over $40,000.00.

We think Judge Aiken's recollection of this statement made by Mr. Temple is accurate, namely: "Oh, well, you know how those things are. They were just trying to protect Dr. Edmunds."

The sales at the same time of the Herman Home and the Hodges House on the south side of Main street have no direct bearing on the case but do serve in a general way to show what manner of auction it was.

The Herman House was sold to a Mr. Lewis for $12,000.00 but that sale with the consent of Dr. Edmunds was immediately cancelled. For the Hodges House Julius Baum bid $7,500.00 or $8,000.00 and then withdrew. The auctioneer continued to cry this property and as Baum was leaving the place of sale it was being carried at $11,800.00. Later he was surprised to hear that he had purchased it at that price. As a matter of fact one of the ground men told the auctioneer that there was no sale and he "immediately forgot it."

Of course fraud must be clearly proven, but proof, of necessity, is frequently circumstantial. In this cause we think that it has been established and that the final judgment of the chancellor is supported by the evidence.

Having reached the conclusion that the sale was tainted by puffing or by-bidding, we must determine its effect.

"Moreover, in such case it is settled that the buyer of property has the right to rely upon the representations made by the seller with reference to the property which from their nature might induce the buyer to enter into the contract on the faith of them, and evidence of the seller that the purchaser did not rely upon such representations must be of the clearest and most satisfactory character in order to rebut the inference that the buyer did rely upon such representations. *Wilson* v. *Carpenter*, 91 Va. 183, 21 S. E. 243, 50 Am. St. Rep. 824; *Fitzgerald* v. *Frankel, supra* (109 Va. 603, 64 S. E. 941)." *Strickland* v. *Cantonwine*, 140 Va. 193, 124 S. E. 292, 298.

"The great weight of modern authority is to the effect that the employment of a puffer is illegal and constitutes sufficient ground for the avoidance or rescission of a sale, irrespective of whether such employment was merely for

the purpose of preventing a sacrifice of the property or for the purpose of enhancing the price above the true value thereof. It is generally recognized that the employment of a puffer to enhance the price of property is not only opposed to the soundest principles of public policy, but that a sale made under such circumstances is a fraud upon the purchaser, and consequently is invalid at law." 2 R. C. L. page 1129; Williston on Sales, volume 1, section 298; 6. C. J. page 833.

"It makes no difference that such puffer or by-bidder was employed to prevent a sacrifice of the property and was directed to bid it to a fixed price only; nor does it make any difference that the property only sold at a reasonable price. The purchaser in any such case has a right to repudiate the sale, if he does so promptly, as soon as he ascertains that there was such puffer or by-bidder who bid at the sale." *Peck* v. *List*, 23 W. Va. 338, 48 Am. Rep. 398.

In *Curtis* v. *Aspinwall*, 114 Mass. 187, 19 Am. Rep. page 332, the court said:

"There is some diversity in the decisions as to the circumstances under which by-bidding will invalidate a sale at auction. But it is clear, both upon principle and the weight of the authorities, that when the sale is advertised or stated to be without reserve, the secret employment by the seller of puffers or by-bidders renders the sale voidable by the buyers."

It was there held that this presumption of fraud might be rebutted. But as was said in *Strickland* v. *Cantonwine*, *supra*, the evidence to rebut it must be of the clearest and most satisfactory character.

In other words, one who has shown that puffers or by-bidders are employed has made out a case, and he who seeks to uphold a contract so tainted has upon him the burden of showing that by-bidding did not actually affect the sale. Of course it affected it here. Gwynn's bid was

based upon the sum of these fictitious bids. Apparently he had to go above them to get the properties, and his rights are not changed by the fact that they may have been worth all he gave for them. He had the right to start his bid where the sum of separate bona fide bids left off.

Temple gives this evidence as to an interview he had with Gwynn:

"I went up to see Mr. Gwynn myself and he was lying down on the sofa in his living room and began talking to me about the purchase of this property and said he was satisfied and he had gotten it a little cheaper than he expected. He said he had been going over the situation about two weeks and been studying this property that was advertised and being an apartment man he thought he would be interested in turning this property into an apartment and said for the last two weeks he had been going there and looking it over without letting his wife or anybody know; that he did not want anybody to know he was interested in it. About that time Mrs. Gwynn came in and she said: 'Ben, cannot you get Dr. Edmunds to let Rice out of this buy. I believe it is going to worry him?' I said: 'I don't reckon Dr. Edmunds would have sold it if he had wanted to take it back.' Mr. Gwyn said: 'When I buy anything I buy it and I don't want anybody to take it back.' Then he told me how he wanted his deed made out."

This amounts to no more than a statement by this purchaser to the effect that he then thought he had made a satisfactory bargain and intended to stand by it. At that time he knew nothing of the fraud which had been perpetrated upon him. When this knowledge came to him repudiation promptly followed. And, as we have seen, the question of whether or not the price paid was fair is immaterial. Contracts superinduced by puffing or by-bidding are voidable on account of public policy.

It is true that Gwynn did not testify and by way of

explanation it is said that he was nervous, emotional and sick. For complainants it is said that he was amply able to attend to business.

Had he gone upon the stand he could have been expected to say no more than this, that he had bought the property at public auction and thought that he had made a good bargain and was willing to stand by his purchase until he had ascertained that apparent value had been augmented by puffing. He could not reasonably be expected to say that he had used knowingly as a basis for his bid, bids which were fictitious and irresponsible and made for the express purpose of running up prices.

The decree of February 3, 1930, from which this appeal is taken must be affirmed and it is so ordered.

*Affirmed.*

HUDGINS, J., dissenting:

I do not concur in the views expressed in the majority opinion. My views are set forth in the opinion reported in *ante*, page 528, 159 S. E. 206.